Vernice DUBOSE, et al.

v.

Samuel R. PIERCE, Jr., et al.

Claudia WALTER, et al.

v.

Samuel R. PIERCE, Jr., et al.

Janette LITTLE, et al.

v.

Samuel R. PIERCE, Jr., et al.

Mae PLEASANT, et al.

v.

Samuel R. PIERCE, Jr., et al.

Pantaleon MORALES, et al.

v.

Samuel R. PIERCE, Jr., et al.

Cathy ADAMS, et al.

v.

Samuel R. PIERCE, Jr., et al.

Merry E. GRUNDMAN, et al.

v.

Samuel R. PIERCE, Jr., et al.

Joann JOHNSON, et al.

v.

Samuel R. PIERCE, Jr., et al.

Civ. Nos. H–75–303, H–75–345, H–75–346, H–76–26, N–76–44, H–76–89, H–76–160 and N–76–109.

United States District Court, D. Connecticut.

Feb. 7, 1984.

James C. Sturdevant, San Francisco, Cal., Dennis J. O'Brien, Conn. Legal Services, Inc., Willimantic, Conn., Norman K. Janes, Conn. Legal Services, Inc., Middletown, Conn., Michael Sheehan, New Haven Legal Assistance, New Haven, Conn., Raymond R. Norko, Legal Aid Society of Hartford County, Hartford, Conn., Sue Ann Shay, Neighborhood Legal Services, Hartford, Conn., for plaintiffs.

Linda Hanten, Legal Services Corp., Washington, D.C., amicus curiae.

Sheila Lieber, June R. Carbone, Merril Hirsh, U.S. Dept. of Justice, Civil Division, Washington, D.C., for defendant. Fred H. Altshuler, Altshuler & Berzon, San Francisco, Cal., William H. Clendenen, Jr., Clendenen & Lesser, New Haven, Conn., Thomas V. Siporin, San Fernando Valley Neighborhood Legal Services, Pacoima, Cal.

## RULING ON MOTIONS FOR ATTORNEYS' FEES

BLUMENFELD, Senior District Judge.

### Introduction

In recent years, over 100 congressional enactments have provided for the awarding of attorneys' fees to prevailing litigants. Applicants have responded to this potential source of funds by pursuing fee requests with such tenacity and thoroughness that the Supreme Court has recently been led to warn, "A request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, —— U.S. ——, 103 S.Ct. 1933, 1941, 70 L.Ed.2d 40 (1983) (applying 42 U.S.C. § 1988). One beneficial result of the enormous volume of attorney's fee cases has been a substantial, well-developed body of law. With the guidance of cases such as *Hensley v. Eckerhart, id.*, and *New York State Association for Retarded Children v. Carey*, 711 F.2d 1136 (2d Cir.1983) (applying 42 U.S.C. § 1988), district courts are, for the most part, presented with the task of applying to the case at hand already established principles.

While such is true for many of the issues the parties have brought before this court, this case does raise some novel and unsettled questions. First, is an attorney who began work on a case as a legal services lawyer and continued to act as counsel, both after his transfer to a second legal service firm and after his later entry into private practice, personally entitled to any fees for his work? Second, are prevailing plaintiffs entitled to a multiplier in their fee claim arising under the Equal Access to Justice Act?

Although some issues in this case may be novel, they nevertheless call into play ever-competing policy interests. This court must navigate between the Scylla of Judge Newman's warning in *Carey*—"attorney's fees are to be awarded 'with an "eye to moderation," seeking to avoid either the reality or the appearance of awarding "windfall fees," ' " 711 F.2d at 1139 (citations omitted)—and the Charybdis of Justice Brennan's *Hensley* dissent—"lower courts must not forget the need to ensure that civil rights plaintiffs with bona fide claims are able to find lawyers to represent them," 103 S.Ct. at 1945.

Plaintiffs' counsel have moved for attorneys' fees against defendant United States Department of Housing and Urban Development (HUD) pursuant to 28 U.S.C. § 2412 (Supp. IV 1980), part of the Equal Access to Justice Act (EAJA).[1] Motions have been filed by five public interest law

---

**1.** Technically, only plaintiffs, not their counsel, may move for attorneys' fees. *Oguachuba v.*

firms, and by one individual attorney. The five firms are: Connecticut Legal Services (CLS), San Fernando Valley Neighborhood Legal Services (San Fernando), Legal Aid Society of Hartford County (LASH), Neighborhood Legal Services (of Hartford) (NLS), and New Haven Legal Assistance Association (NHLA). The attorney is James C. Sturdevant. In addition, San Fernando and attorney Sturdevant have filed supplemental fee motions concerning work done by Mr. Sturdevant after April 4, 1979, *see infra* pp. 945–946. CLS has joined in both of San Fernando's motions.

Complicating this case has been a dispute over the right to fees for work performed by Sturdevant.

From October 1975 through April 30, 1978, Mr. Sturdevant worked for CLS. Mr. Sturdevant concedes that CLS has the right to any fees for his work during that time. From May 1, 1978 through October 8, 1978, and also from May 1, 1980 to the present, Mr. Sturdevant asserts that he was self-employed. None of plaintiffs' counsel have challenged Mr. Sturdevant's claim to any fees awarded for his work during those periods.

There is, however, one dispute among plaintiffs' counsel. San Fernando and attorney Sturdevant both claim the right to any fees awarded for Sturdevant's work from October 9, 1978 through April 30, 1980, during which time Sturdevant was a full time employee of San Fernando.

## I. THE HISTORY OF THIS ACTION

This proceeding is the final act of a protracted litigation concerning federal housing subsidies under section 236 of the National Housing Act. Most of the action occurred early on: congressional passage of the subsidy program, the dispute over its implementation, and the ensuing litigation. The settlement of what was by then a national class action provided the case's climax, with the settlement administration as the denouement. The struggle over attorneys' fees is what remains.

In 1968, Congress enacted, as section 236 of the National Housing Act,[2] a rental housing program which provided mortgage insurance and made interest reduction payments on behalf of owners of qualifying low-income housing projects. Housing and Urban Development Act of 1968, Pub.L. No. 90–448, § 201, 82 Stat. 476. Paragraph (f) of section 236 established that the rental for each unit would be either a "basic rental," equal to the operating cost, or a higher value not to exceed either 25 per cent of the tenant's income or the unit's market value. Codified at 12 U.S.C. § 1715z–1(f) (1970).

In the Housing and Community Development Act (HCDA) of 1974, Pub.L. No. 93–383, 88 Stat. 633, Congress amended section 236 to provide an additional form of subsidy, called an "operating subsidy."[3] This subsidy was designed to shield tenants from rent increases due to increases in property taxes and utility costs. The subsidy program paid project owners in full for these increases, except that the subsidies could not be used to drive the basic rent below 30 per cent of the tenant's income.[4]

*INS,* 706 F.2d 93, 97–98 (2d Cir.1983); *but see Ceglia v. Schweiker,* 566 F.Supp. 118, 120 n. 1 (E.D.N.Y.1983). However, the real actors in these fee motions are plaintiffs' counsel, and it will at times avoid confusion to consider counsel as the real "moving parties."

2. The "National Housing Act" refers to Chapter 13 of Title 12, United States Code, found at 12 U.S.C. §§ 1701 *et seq. See* 12 U.S.C. § 1701 (1976) (short title).

3. Section 212 of this Act contained the new subsidy program (codified at 12 U.S.C. §§ 1715z–1(f)(3) and (g) (Supp. IV 1974)).

4. 12 U.S.C. § 1715z–1(f)(3) (Supp. IV 1974) provided:

For each project there shall be established an initial operating expense level, which shall be the sum of the cost of utilities and local property taxes payable by the project owner at the time the Secretary determines the property to be fully occupied, taking into account anticipated and customary vacancy rates. At any time subsequent to the establishment of an initial operating expense level, the Secretary is authorized to make, and contract to make, additional assistance payments to the project owner in an amount up to the amount by which the sum of the cost of utilities and

These subsidies of the owners' operating costs resulted in decreased basic rents.

In addition, the Act established a "reserve fund" from which the operating subsidies could be paid. To build up this fund, project owners were required to contribute all rents received in excess of the "basic rental." [5]

HUD failed to implement the section 236 operating subsidy program while allowing owners to increase rental charges to cover increased operating costs. That squeeze on the tenants prompted this action and similar suits across the country. In 1979, this and several other actions were settled jointly. The settlement called for reimbursements of those increases in rental charges to present and former tenants nationwide. The administration of these payments has been supervised by the court in *Underwood v. Pierce*, No. 79-1318-HP (C.D.Cal.).

## A. *Events Preceding Settlement*

This matter started before this court as three separate class actions, each brought by tenants in a different section 236 housing project. The tenants were aggrieved by HUD's approval of increases in the "basic rents" for these projects. They challenged the rent increases as excessive in view of the operating costs and sought to compel HUD to pay operating subsidies to the project owners to cover that part of each increase which was due to increased utility costs and property taxes. On December 15, 1975, after a consolidated hearing, this court certified plaintiff classes in each of these actions and issued preliminary injunctions requiring HUD to make operating subsidy payments to project owners, thus relieving plaintiffs of portions of the rent increases which were due to increased utility costs and property taxes. *Dubose v. Hills*, 405 F.Supp. 1277, 1278–79 & nn. 8, 10, 1280, 1292–93 (D.Conn.1975), *modified*, 420 F.Supp. 399 (D.C.1976).

HUD did not appeal the order regarding these three projects, *see Dubose v. Harris*, 434 F.Supp. 227, 229 (D.C.1977); instead, it continued to resist making operating subsidy payments on behalf of tenants in other projects, *see Dubose v. Hills*, 22 Fed.R. Serv.2d 476, 477 (D.C.1976). Six similar suits were subsequently filed in this district, one of which was withdrawn. On May 27, 1976, this court consolidated the remaining eight pending actions into one statewide class action, and issued a preliminary injunction compelling HUD to pay operating subsidies throughout Connecticut. *Id.* at 477–79.

HUD appealed this statewide preliminary injunction. On June 28, 1976, this court

---

local property taxes exceeds the initial operating expense level, but not to exceed the amount required to maintain the basic rentals of any units at levels not in excess of 30 per centum, or such lower per centum not less than 25 per centum as shall reflect the reduction permitted in clause (ii) of the last sentence of paragraph (1), of the income of tenants occupying such units. Any contract to make additional assistance payments may be amended periodically to provide for appropriate adjustments in the amount of the assistance payments. Additional assistance payments shall be made pursuant to this paragraph only if the Secretary finds that the increase in the cost of utilities or local property taxes, is reasonable and is comparable to cost increases affecting other rental projects in the community.

**5.** 12 U.S.C. § 1715z–1(g) (Supp. IV 1974) provided:

The project owner shall, as required by the Secretary, accumulate, safeguard, and periodically pay to the Secretary all rental charges collected in excess of the basic rental charges. Such excess charges shall be credited to a reserve fund to be used by the Secretary to make additional assistance payments as provided in paragraph (3) of subsection (f) of this section. During any period that the Secretary determines that the balance in the reserve fund is adequate to meet the estimated additional assistance payments, such excess charges shall be credited to the appropriation authorized by subsection (i) of this section and shall be available until the end of the next fiscal year for the purpose of making assistance payments with respect to rental housing projects receiving assistance under this section. For the purpose of this subsection and paragraph (3) of subsection (f) of this section, the initial operating expense level for any project assisted under a contract entered into prior to August 22, 1974, shall be established by the Secretary not later than 180 days after August 22, 1974.

denied defendants' request for a stay pending appeal. The Second Circuit did the same on July 20, 1976. *See Dubose v. Harris,* 434 F.Supp. at 239.

Meanwhile, similar actions had been filed across the country. *See Dubose v. Harris,* 82 F.R.D. 582, 585 (D.C.1979). Understandably, one of these was a nationwide class action filed in the District of Columbia. *See Underwood v. Hills,* 414 F.Supp. 526, 528 (D.D.C.1976). In *Underwood,* Judge Pratt, on June 8, 1976, issued a permanent injunction compelling HUD to make operating subsidy payments. *Id.* at 532. On October 18, 1976, the Supreme Court stayed this order pending appeal. 429 U.S. 892, 97 S.Ct. 250, 50 L.Ed.2d 175 (1976) (action by whole Court). Relying on the Supreme Court's stay in *Underwood,* HUD renewed its application to the Second Circuit for a stay pending appeal. The Second Circuit granted this stay on December 27, 1976. *See Dubose,* 434 F.Supp. at 230. On February 22, 1977, the Supreme Court refused to vacate this stay. 429 U.S. 1085, 97 S.Ct. 1092, 51 L.Ed.2d 531 (1977) (action by whole Court).

HUD then ceased all operating subsidy payments statewide, including those covered by this court's first order of December 1975, which HUD had not appealed. *See Dubose,* 434 F.Supp. at 230. This court held that HUD had thus violated the December 1975 order, and ordered HUD to continue compliance with that order. *Id.* at 231, 232. While noting that "it would be within this court's discretion to hold defendants in contempt," *id.* at 232, this court declined to do so because it was "not convinced that defendants acted in bad faith or out of a willful purpose to disobey the orders of this court," but thought rather that defendants had been confused by "ambiguities in the situation confronting them." *Id.*

### B. *The Settlement*

On May 23, 1977, the Supreme Court granted certiorari in two cases similar to *Dubose, Harris v. Ross* and *Harris v. Abrams.* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977). Up to this time the lower courts had unanimously ruled in favor of the plaintiffs in the various actions. *See Dubose,* 82 F.R.D. at 585 & n. 12.

Before the Supreme Court could decide *Ross* and *Abrams,* the parties in those actions, this (consolidated) action, and *Underwood* agreed on a settlement. *See* Stipulation for Settlement (hereinafter "Stipulation") reproduced as an appendix to this court's opinion approving the settlement. *Dubose v. Harris,* 82 F.R.D. 582, 592–99 (D.C.1979).[6] The settlement in *each* of these four actions was contingent on court approval of the settlement in each of the others. Stipulation ¶ 7; Settlement Agreement ¶ 7.

Under the proposed settlement, HUD would pay into the *Underwood* court a settlement fund of about $60 million, consisting of the balance of its "reserve fund" as of September 30, 1977. Stipulation ¶ 2. The settlement fund was to be used to reimburse to tenants, as nearly as practicable, the amounts which should have been paid by HUD as operating subsidies. "Every tenant who resided in a Section 236 project ... between February 1, 1975 and September 30, 1977, and who paid in excess of 30 percent of his or her adjusted monthly income ... for rent ... as of the last month of residence in the project, the last month before receiving a federal rental subsidy, or September, 1977, whichever is earlier, will be eligible to receive retroactive tax and utility cost subsidy payments." Stipulation ¶ 3(a).[7] Each eligible recipient would receive a payment equal to "the number of months between February 1, 1975 and September 30, 1977, during which he or she resided in a Section 236 project without receiving an additional federal

---

6. Appended to the Stipulation, *see* Stipulation n. 2, was a prior Settlement Agreement, which is reproduced at 82 F.R.D. at 599–605.

7. A tenant did not have to be a member of the class certified in *Underwood, Dubose, Ross,* or *Abrams* in order to collect. A tenant in a class in any similar action could elect to participate in this settlement. Stipulation ¶ 3(a).

rental subsidy, multiplied by the tenant's monthly share of the actual increases in tax and utility costs as of September 30, 1977 at that Section 236 project." *Id.* ¶ 3(b).[8]

If the tenants' claims made under this settlement exceeded the settlement fund, claimants were to receive pro rata shares. If the claims totaled less than the settlement fund, the excess was to be returned to HUD's reserve fund. Stipulation ¶ 3(e).

The parties were aware that it would require a major undertaking to locate eligible claimants, inform them of the settlement, and evaluate and pay their claims. This process has been referred to by the parties as "settlement administration." Under the Stipulation, settlement administration would be performed in the main by Price Waterhouse and Co. (PW), a national accounting firm, under the direction of plaintiffs' counsel. Stipulation ¶ 4(b) (plaintiffs' counsel to direct pilot test of claim forms); *see also* Stipulation ¶ 4(a), *together with* "Proposal to Conduct a Settlement Distribution in Connection with *Underwood v. Hills* and *Dubose v. Hills*, August 9, 1978" (filed Nov. 8, 1978) at 4 ("we would be prepared to administer all phases of the distribution project under the direction of Plaintiff's counsel").

The Stipulation assigned certain tasks directly to plaintiffs' counsel. They would prepare a form of preliminary notice to be mailed to current tenants, ¶ 6(a)(2); cause copies of these notices to be published in "the newsletters of the Legal Services Corporation, the National Housing Law Project, and other publications directed to legal services attorneys and their clients," *id.;* similarly publish final notices, ¶ 6(b)(3); and, along with PW, "make reasonable ef-

forts to minimize the costs of administration of the settlement and distribution of the settlement fund," ¶ 4(d).

HUD was to aid the settlement effort in various ways. First, HUD was to provide PW with detailed information concerning all section 236 projects. ¶ 5. Second, HUD was to ensure that project owners provided PW with names and last-known addresses of former tenants who had resided in their projects from February 1, 1975 through September 30, 1977. ¶ 6(b)(2), (c). Third, HUD was to require project owners to post and distribute notices of the settlement in their projects, and, if necessary, HUD was to do so itself. ¶ 6(b)(1), (c). Fourth, HUD was to publicize the settlement in various publications. ¶ 6(a)(2), (b)(3).[9]

The Stipulation provided for payment of various expenses. The settlement fund would be used to pay PW, an escrow agent, and "all costs of administration or out-of-pocket costs, including travel, incurred by plaintiffs' counsel" in "obtaining approval of this settlement, administration of the settlement, and distribution of the settlement fund." ¶ 4(c). Additionally, the settlement fund would also be used to pay HUD's expenses in providing notice of the settlement and in distributing claim forms. ¶ 6(a)(2), (b)(3). HUD would bear three particular costs: postage, a WATS line, and the cost to PW of assembling and copying documents requested by HUD for auditing purposes. ¶ 4(d). After identifying these items, the Stipulation concluded: "It is the intent of the parties that distribution of the settlement fund shall involve no other substantial costs or expenditures by HUD." *Id.* The Stipulation explicitly provided that "[n]one of the sums distributed may be used to pay attorney's fees." ¶ 3(f).

---

**8.** In some cases, project owners, rather than passing tax and utility cost increases on to tenants, had absorbed the increases themselves. In such cases, payments would be made to the project owners rather than the tenants. Stipulation ¶ 3(d).

**9.** HUD agreed that benefits paid out under the settlement would "not be included as income, resources or assets under any HUD program where eligibility or continued eligibility is

defined in terms of a family's or individual's income, resources or assets." HUD further agreed to "urge" the Department of Agriculture, and the Department of Health, Education and Welfare, that they not treat payments under the settlement as "income, resources or assets in determining eligibility for governmental benefits in any program administered by these Departments." Stipulation ¶ 8(b).

On November 13, 1978, this court preliminarily approved the settlement. *See Dubose,* 82 F.R.D. at 585–86. On January 19, 1978, Judge Pratt preliminarily approved the settlement in *Underwood. Underwood* Docket Sheet (Exhibit A to Sturdevant Declaration filed June 29, 1983). The proposed settlement in *Underwood* included "Rules of Counsel." *See Dubose,* 82 F.R.D. at 592 n. 38. (A copy of these Rules of Counsel is given as Exhibit B in the Sturdevant Declaration filed June 29, 1983). These Rules established a Committee of Counsel (COC) consisting of Patricia M. Tenoso, plaintiffs' lead counsel in *Underwood;* Mary S. Burdick, plaintiffs' co-counsel in *Underwood;* and James C. Sturdevant, plaintiffs' lead counsel in *Dubose.* The COC was to perform the functions of plaintiffs' counsel as outlined in the Stipulation for Settlement. Judge Pratt's rationale for approving this composition of the COC does not appear in the record in this case.

On February 23, 1979, this court formally approved the settlement, noting that the members of the COC seemed well qualified for their task. *Dubose,* 82 F.R.D. at 592 & nn. 37–38. On April 5, 1979, Judge Pratt formally approved the settlement in *Underwood. Underwood v. Harris,* No. 76–469 (D.D.C. April 9, 1979), slip op. at 1. On that date Judge Pratt transferred the action to the Central District of California, with the parties' consent, because "the agent administering the distribution of the fund (Price Waterhouse), the bank in which the fund has been deposited and invested (Crocker) and all members of the Committee of Counsel are all located in Los Angeles, California." *Id.* at 1. He further approved the appointment of a fourth member to the COC, whose identity would be decided by the District Court in California. *Id.* at 2.

C. *Events Since Settlement*

Under the supervision of the *Underwood* court, Judge Pregerson presiding, settlement administration has been almost completely accomplished. Approximately $45 million was paid out to claimants. Interest earned by the fund has more than covered expenses. The unexpended principal (approximately $15 million), as well as the unused interest (less a reserve of $500,000, and further less a reserve for uncashed checks), has been returned to HUD's reserve fund. Sturdevant Declaration of June 29, 1983, Exhibits HH, II (orders in *Underwood* dated April 15, 1982, and Jan. 26, 1983, ordering return of principal and interest, respectively). As of May 1983, apparently no tasks remained except those associated with locating recipients of uncashed checks. *See* Declaration of Peter B. Frank, filed May 31, 1983, ¶ 4.

The *Underwood* plaintiffs have pressed fee motions in that court. Judge Pregerson in *Underwood* held that the plaintiffs are entitled to fees under the EAJA. *Underwood v. Pierce [Underwood I],* 547 F.Supp. 256, 263–64 (C.D.Cal.1982), *appeal pending,* App. No. 83–5773 (9th Cir.). The court awarded fees to the Western Center on Law and Poverty (Western Center) for work done by attorneys Tenoso and Burdick during 1976–1981 and 1976–1982 respectively. The court allowed hourly rates ranging from $85/hour in 1976 to $120/hour in 1981 for Tenoso, and ranging from $80/hour in 1976 to $120/hour in 1982 for Burdick. The court further allowed an upward adjustment factor, or "multiplier," of 3.5. The total award was $1,129,450.00. *Underwood v. Pierce [Underwood II],* No. 79–1318–HP (C.D.Cal. Feb. 3, 1983), slip op. at 8, *appeal pending,* App. No. 83–5773 (9th Cir.).

Initially, Sturdevant and San Fernando moved in this court for fees for Sturdevant's work only until April 5, 1979, the date on which *Underwood* was transferred to the Central District of California; Sturdevant and San Fernando filed motions in *Underwood* concerning Sturdevant's work on and after April 5, 1979. However, in an unpublished order on November 29, 1982, filed February 1, 1983, the *Underwood* court dismissed these latter fee motions. That court reasoned that, though Sturdevant had appeared before it as a member of the COC, Sturdevant did so as counsel in *Dubose,* over which case that court lacked

jurisdiction. Accordingly, Sturdevant and San Fernando have since filed supplemental motions in this court seeking fees for Sturdevant's work on and after April 5, 1979, thus consolidating all of their fee requests in this court.

## II. PLAINTIFFS' ENTITLEMENT TO FEES

Plaintiffs are seeking attorney fees under the Equal Access to Justice Act (EAJA), Pub.L. No. 96–481, Title II, § 204, 94 Stat. 2325, 2327–29 (1980), *codified at* 28 U.S.C. § 2412 (Supp. IV 1980). The EAJA provides two grounds for a fee award in actions against the United States. First, "[u]nless expressly prohibited by statute," the government "shall be liable for ... fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b). Plaintiffs claim that the government's bad faith conduct justifies a fee award under the first alternative of this provision.

At common law, fees may be awarded against a party who acts " 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). HUD's conduct has been far from exemplary, yet, none of its conduct justifies a fee award on this ground. First, though HUD's litigation position that it had absolute discretion to decide not to fund the operating subsidy program was unreasonable, *see infra* p. 949, there is nothing to suggest that HUD's position was taken in bad faith. Next, though HUD did disobey this court's injunction of December 15, 1975, I concluded that HUD's disobedience arose out of confusion rather than out of "bad faith or ... a willful purpose to disobey the orders of this court," *Dubose,* 434 F.Supp. at 232. Finally, regarding HUD's conduct during settlement administration, Judge Pregerson stated:

> [T]hough admittedly, there have been deficiencies in HUD's performance, my con-

clusion is that there is really no substantial basis to hold HUD in contempt. Its performance has not been outstanding, it has bordered on the satisfactory; but it is certainly not contemptuous.

*Underwood,* Reporter's Transcript of Proceedings on January 26, 1983 at 24.

■ The EAJA provides a second, alternative ground for fee awards against the United States.

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).

Plaintiffs in this case were prevailing parties. When this court approved the settlement, it observed that the settlement "will result in payments to eligible claimants and in greater amounts than would be available through ultimately successful litigation." *Dubose,* 82 F.R.D. at 592. A favorable settlement, no less than a favorable judgment, confers the status of "prevailing party." Indeed, in the legislative history accompanying the EAJA, the Congress specifically noted that under the EAJA, "a party may be deemed prevailing if the party attains a favorable settlement of his case, *Foster v. Boorstin,* 561 F.2d 340 (D.C.Cir.1977)." H.R.Conf.Rep. No. 1434, 96th Cong., 2d Sess. [hereinafter, Conference Report] 22, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5003, 5010, *cited with approval in Underwood I,* 547 F.Supp. at 259 & n. 4; H.R.Rep. No. 1418, 96th Cong., 2d Sess. [hereinafter House Report] 11, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4984, 4990. *See also Citizens Coalition for Block Grant Com-*

*pliance v. City of Euclid,* 537 F.Supp. 422, 424–25 (N.D.Ohio 1982).

### A. Does the EAJA Apply to Cases with Non-Fee-Paying Clients?

■ Though the EAJA literally provides for an award of fees "incurred" by a party, 28 U.S.C. § 2412(d)(1)(A), the statute also applies to cases, such as this case, in which clients are under no obligation to pay their lawyers. Other courts have so held. *San Filippo v. Secretary of Health and Human Services,* 564 F.Supp. 173, 175–77 (E.D.N.Y.1983); *Hornal v. Schweiker,* 551 F.Supp. 612, 615–17 (M.D.Tenn.1982); *Kauffman v. Schweiker,* 559 F.Supp. 372 (M.D.Pa.1983); *Kinne v. Schweiker,* No. 80–81 Civ., slip op. at 1–8 (D.Vt. June 30, 1982), *vacated,* (D.Vt. Dec. 29, 1982). I find these opinions persuasive. The sole contrary authority, *Cornella v. Schweiker,* 553 F.Supp. 240, 245–48 (D.S.D.1982) relies on the earlier, vacated *Kinne* opinion.

### B. Was This Case "Pending" on the EAJA's Effective Date?

■ The EAJA, by its terms, applies to "any civil action … which is pending on, or commenced on or after," October 1, 1981. Pub.L. No. 96–481, § 208, 94 Stat. 2321, 2330 (enacted October 21, 1980), *reprinted* 5 U.S.C. § 504 (Supp. V 1981). On the EAJA's effective date, the parties to this case were carrying out the settlement agreement under the supervision of the *Underwood* court. At issue is whether a case, in that posture, was "pending" for purposes of the EAJA.

The meaning of "pending" in the EAJA has been broadly construed. The mere pendency of a motion for attorney fees, before the trial court or on appeal, is sufficient to render the entire action "pending."

**10.** *See contra Commissioners of Highways v. United States,* 684 F.2d 443, 444–45 (7th Cir. 1982) (reasoning that waivers of sovereign immunity must be strictly construed, court held that mere pendency of appeal from denial of attorney fees did not render the action "pending").

**11.** *Cf. New York State Association for Retarded Children v. Carey,* 711 F.2d 1136 (2d Cir.1983).

*Knights of the Ku Klux Klan v. East Baton Rouge Parish School Board,* 679 F.2d 64, 67–68 (5th Cir.1982); *United States ex rel. Heydt v. Citizens State Bank,* 668 F.2d 444, 446 (8th Cir.1982); *WATCH v. Harris,* 535 F.Supp. 9, 14 (D.Conn.1981) (Clarie, C.J.) (alternative holding).[10] *See also Bradley v. School Board,* 416 U.S. 696, 711, 715, 94 S.Ct. 2006, 2016, 2018, 40 L.Ed.2d 476 (1974) (similarly construing fee statute in section 718 of title VII of the Emergency School Aid Act, 20 U.S.C. § 1617 (Supp. II 1979); if statute is silent on its application "to pending cases," statute should generally be applied to them, because a court should "apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary"); *Rainey v. Jackson State College,* 551 F.2d 672, 675 & n. 4, 676 & n. 5 (5th Cir.1977) (similarly construing Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988 (Supp. IV 1980), noting that, in Act's legislative history, *Bradley* was cited several times "as a prototypical case for awarding attorneys' fees in pending cases").

■ In the present case, no final judgment had issued on the EAJA's effective date. This court had retained jurisdiction over the case pending settlement administration, which was being performed by the *Underwood* court. *Dubose,* 82 F.R.D. at 587, 592. The settlement administration had been proceeding continuously since settlement, and as of October 1, 1981, much unfinished business remained. *See, e.g., Underwood* Docket Sheet (Exhibit A to Sturdevant Declaration filed June 29, 1983). Under these circumstances, this action was "pending" on the Act's effective date.[11]

In *Carey,* a consent decree was signed April 30, 1975. The district court retained jurisdiction and "regularly" handled subsequent litigation concerning interpretation and enforcement of the decree. In 1976, while these supplemental proceedings were being handled, the Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988 (Supp. IV 1980), took effect. *Id.* at 1139–40. The Second Circuit held that the

*See also Underwood I*, 547 F.Supp. at 259–60 (holding that the *Underwood* action was "pending" on the EAJA's effective date).

## C. The Compensability for Work Performed Before the Act's Effective Date

■ The EAJA, when applicable to a given case, authorizes fee awards for work done before as well as after the Act's effective date. This holding is explicit in four cases construing the EAJA. *Berman v. Schweiker*, 713 F.2d 1290, 1291 (7th Cir. 1983); *Tyler Business Services, Inc. v. NLRB*, 695 F.2d 73, 77 (4th Cir.1982); *Nunes-Correia v. Haig*, 543 F.Supp. 812, 814–16 (D.D.C.1982); *Underwood I*, 547 F.Supp. at 260–61 & n. 7. This holding is implicit in the cases cited in part B *supra* which construe the EAJA, *Knights of the Ku Klux Klan, United States ex rel. Heydt*, and *WATCH*, as well as in the cases cited there which construe other fee statutes, *Bradley, Rainey*, and *Carey*.

## D. The Timeliness of the Instant Fee Motions

■ The EAJA provides that "a party seeking an award of fees ... shall, within thirty days of final judgment in the action, submit to the court an application." 28 U.S.C.A. § 2412(d)(1)(B). There has been no final judgment disposing of this case.[12] Therefore, the instant fee motions are not stale.

The statute's language just quoted might be thought to imply that a fee motion must await final judgment, and that the instant motions are therefore premature. "This language, however, should not be construed to require a final judgment on the merits before a court may award fees." House Report 18, *reprinted in* 1980 U.S.

Code Cong. & Ad.News at 4997. The court then has some discretion to make interim fee awards.

In this case, almost all of the attorneys' work in this case has been completed, yet final judgment must await the "winding up" of settlement administration, *see supra* p. 945. This case has been pending since 1975, and further delay in any fee awards would work a hardship on the fee recipients. *Cf. Bradley*, 416 U.S. at 723, 94 S.Ct. at 2022. Accordingly, an interim fee award is proper. *See Underwood II* (making similar interim award); *cf. In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.Supp. 680, 703–04 (D.Minn.1975) (making interim antitrust fee award during settlement administration).

## E. HUD's Affirmative Defenses

Although plaintiffs meet the prima facie requirements for an award under section 2412(d), the statute permits HUD to assert two affirmative defenses. Section 2412(d)(1)(A) provides that the court "shall award ... fees ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."

### 1. Was HUD's Position "Substantially Justified"?

■ Section 2412(d) precludes a fee award if "the court finds that the position of the United States was substantially justified."[13] "The test of whether or not a Government action is substantially justified is essentially one of reasonableness. Where the Government can show that its case had a reasonable basis both in law and fact, no award will be made." House Report 10, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 4989. *Accord, Spencer v.*

---

ongoing supplemental proceedings were sufficient to render the entire action "pending" for the purpose of a fee award. *Id.* at 1144–45.

**12.** An exceptional case might contain more than one final judgment. In such a case, fee requests for work done in an early phase of the case may be stale if delayed until judgment in a later phase. *Cf. Wheeler v. Durham City Board of*

*Education*, 585 F.2d 618, 621–23 (4th Cir.1978) (awards under 42 U.S.C. § 1988 and 20 U.S.C. § 1617). *See generally, Carey*, 711 F.2d at 1145.

**13.** This language was taken from Federal Rule of Civil Procedure 37 (discovery sanctions). *See* House Report 13, 18, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 4992, 4997.

*NLRB,* 712 F.2d 539, 557 (D.C.Cir.1983); *Knights of the Ku Klux Klan,* 679 F.2d at 68. The standard may in fact be slightly more stringent. *Spencer,* 712 F.2d at 558. The burden of proving reasonableness rests with the government. House Report at 10–11, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 4989. *Accord, Tyler Business Services, Inc. v. NLRB,* 695 F.2d 73, 75 (4th Cir.1982). This standard of substantial justification represents a middle ground between an award of fees to every party who prevails against the government, and a requirement that the prevailing party prove that the government's position was "arbitrary, frivolous, unreasonable, or groundless." House Report 14, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 4993. *Accord, Knights of the Ku Klux Klan,* 679 F.2d at 68. Beyond this general guideline of "reasonableness," the "substantial justification" standard remains largely undefined. *See* Note, *The Award of Attorney's Fees Under the Equal Access to Justice Act,* 11 Hofstra L.Rev. 307, 320–27 (1982). The legislative history does, however, note two further factors. First, to show substantial justification, the government need not establish "that its decision to litigate was based on a substantial probability of prevailing." House Report 11, *reprinted in* 1980 U.S. Code Cong. & Ad.News at 4990.[14] Second, certain types of case dispositions, including dismissals of prior suits, and substantial differences between the government's claims at pleading and the settlement agreed to, provide some indication that the government's position was not substantially justified. *Id., reprinted in* 1980 U.S. Code Cong. & Ad.News at 5011 (discussing "substantially justified" as applied to agency actions).

HUD claims that its position in refusing to pay operating subsidies was substantially justified. This litigation started because HUD did not put into operation a housing subsidy program. *Dubose,* 405 F.Supp. at 1279. This court held first that the housing subsidy program was mandatory, and second that, even if HUD had some discretion to suspend the program, it had abused that discretion. *Id.* at 1288, 1291–92. This court explicitly held that HUD's abuse of discretion was "unreasonable." *Id.* at 1292.

Although HUD's action in resisting initiation of the operating subsidy program was held to be "unreasonable," and the standard for substantial justification is one of "reasonableness," it does not automatically follow that HUD's "position" was not "substantially justified." The standard in this case for determining whether HUD had abused its discretion was itself one of reasonableness. *Id.* at 1289. Thus, the mere fact that HUD lost on the merits (*i.e.,* that this court found an abuse of discretion) necessarily implied that HUD's action in refusing to pay operating subsidies was not "reasonable." But Congress, in passing the EAJA, rejected the notion that the government should be liable for fees whenever it lost. *See supra* p. 948. Accordingly, something more is needed to show that the government's "position" was not "substantially justified."

This paradox is resolved if the government's "position" in court, rather than its underlying conduct toward the plaintiffs by whom it is being sued, is the focus of attention. The proper question then is, even though HUD's action was held not to be reasonable, was HUD nevertheless substantially justified in *making its claim in court.*[15]

---

**14.** Further, the provision for denial of fees if "special circumstances make an award unjust" is designed in part "to insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts." House Report, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 4990. *But see Spencer v. NLRB,* 712 F.2d at

558–59 (when government attempts to change settled law, randomly chosen party to government's test suit deserves compensation).

**15.** The analysis of the District of Columbia Circuit in *Spencer,* 712 F.2d at 552–53; *see also id.* at 546–47 (noting split of authority), as to the meaning of "the position of the United States" and "substantially justified" far surpasses, in thoroughness and insight, any other analysis of

This court's prior opinion shows that HUD's position was not merely unreasonable but had no justifiable basis. HUD suspended the program because it believed that "such a limited and discriminatory program" was " 'inequitable,' " 405 F.Supp. at 1290, even though Congress had "specifically indicated its disagreement with precisely this sort of 'all or nothing' analysis," *id.* "Surely Congress has the power to solve a specific problem with which it is familiar without running the risk of administrative nonenforcement because it has not gone far enough, or not gone in the direction considered desirable by the executive branch." *Id.* at 1290–91. "The Secretary's claimed rationale for refusing to fund the program with her contract authority—its inequitable coverage—misses the point of Congress' actions entirely and does not constitute a valid exercise of discretion." *Id.* at 1291–92. While HUD purported to rely on a case which held that it had a *narrow* discretion to suspend housing subsidy programs, *see id.* at 1282 & n. 22, HUD claimed " 'full discretion to determine whether the program should be implemented,' " *id.* at 1281 (quoting HUD), a discretion which it clearly did not, and could not, have.

HUD argues, however, that this court's opinion in 1975 is not the last word on whether HUD's position was substantially justified. As detailed above, following the Supreme Court's 1976 stay of the *Underwood* permanent injunction, the Second Circuit granted a stay of this court's statewide preliminary injunction. The Supreme Court in 1977 refused to vacate that stay. Also in 1977, the Supreme Court granted certiorari in two similar cases. *See Dubose*, 82 F.R.D. at 584; *supra* pp. 942–943. These developments, however, are too opaque to convince this court that HUD's position was substantially justified.

First, the grants of certiorari may have been extended not with reversal in mind, but with the purpose "to resolve the issues against HUD once and for all, thereby rejecting HUD's position which forced low-income tenants to bring class actions in district courts throughout the country," *Underwood I*, 547 F.Supp. at 262. *See* Supreme Court Rule 17.1(c) (indicating that review might be granted if "a federal court of appeals has decided an important question of federal law which has not been, but should be, settled by this Court"). Additionally, a grant of certiorari need only have commanded the votes of four Justices, not the five needed for a majority of the Court.

Further, the significance of the stays is not clear. HUD has offered no authority to show that the Supreme Court stay pending appeal in *Underwood* implies any view as to the merits. Though the Second Circuit usually requires likelihood of success on the merits as a prerequisite for a stay pending appeal, *Eastern Air Lines, Inc. v. CAB*, 261 F.2d 830, 830–31 (2d Cir.1958) (adopting criteria in *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921, 925 (D.C.Cir. 1958)), after the Supreme Court's stay in *Underwood*, the Second Circuit, which had previously denied a stay in this case, *supra* p. 942, had little choice but to grant one.

Even if the grants of certiorari, and the stays, did indicate a view by the Supreme Court that HUD had some substantial chance of prevailing on the merits, that view would not be controlling here. The grants of certiorari and the stays are based on preliminary analyses. A legal claim which initially appears to deserve serious consideration may on closer study appear not merely incorrect but groundless. Indeed, HUD's position had some initial appeal to this court because of an apparently similar case, *Pennsylvania v. Lynn*, 501

---

which this court is aware. *See also Bennett v. Schweiker*, 543 F.Supp. 897, 898–99 (D.D.C. 1982), and *Wolverton v. Schweiker*, 533 F.Supp. 420, 424–25 (D.Idaho 1982). In those cases, the court had reversed an agency action because it was not based on substantial evidence. In deal-

ing with a fee motion under the EAJA, the court considered whether the agency was nevertheless substantially justified in making the claim to the court that substantial evidence existed to support its decision.

F.2d 848 (D.C.Cir.1974), decided in HUD's favor. *See Dubose v. Hills,* 405 F.Supp. at 1282. After detailed discussion, however, this court clearly distinguished the facts of this case from *Lynn. See id.* at 1288–92.[16] Thus, it is perfectly understandable that HUD's position, which initially appeared to have substantial merit, was in fact not substantially justified.

The view that HUD's position was not substantially justified is strengthened by the unanimous rulings of lower courts against HUD in suits across the country. *See Dubose v. Harris,* 82 F.R.D. at 585 & n. 12 (citing district and circuit opinions). Although I did state that the grants of certiorari and the stays cast doubt upon the unanimous rejection to date of HUD's position, *id.* at 585, on reflection I conclude, for the reasons above, that this doubt was minimal. Furthermore, the government's agreement to a settlement which provided for relief to plaintiffs as great, if not greater, than what had been awarded by this court and several others, provides a strong indication that HUD itself did not consider that the government's position was substantially justified.

In sum, HUD has not established its first affirmative defense, that its position was "substantially justified."

### 2. *Do "Special Circumstances Make an Award Unjust"?*

█ The EAJA provides that no fees shall be awarded if "the court finds ... that special circumstances make an award unjust." This provision "gives the court discretion to deny awards where equitable considerations dictate an award should not be made." House Report 11, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 4990.

HUD asserts that the terms of the settlement, and the intent of the parties, make a fee award unjust. The terms of the settlement do not include a blanket prohibition of fees from any source. The Stipulation for Settlement, ¶ 3(f), provides: "None of the sums distributed may be used to pay attorney's fees." *Dubose,* 82 F.R.D. at 594. This provision bars a fee award from the settlement fund.[17] At the time of settlement, this fund represented the only known possible source of attorney fees. *See City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 469 (2d Cir.1974); *Sprague v. Ticonic National Bank,* 307 U.S. 161, 164, 59 S.Ct. 777, 778, 83 L.Ed. 1184 (1938); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 391–92, 90 S.Ct. 616, 625–626, 24 L.Ed.2d 593 (1970). The parties not contemplating any other possible source of funds, did not address the attorney fee issue further.[18]

HUD contends that, if it had thought that a fee award were possible, it would not have agreed to the settlement. This ignores Congress' intention that the EAJA apply retroactively to cases already substantially resolved, *see supra* part B. In this regard, Congress made no distinction between cases resolved by litigation to judgment and those resolved by settlement. Application of the EAJA to this settlement is therefore not patently "unjust." Although the court in *Aho v. Clark,* 608 F.2d 365, 367 (9th Cir.1979), in denying a fee award under 42 U.S.C. § 1988 employed the rationale urged by HUD, that case is distinguishable. The settlement in *Aho* was concluded after the relevant fee statute took effect, *id.* at 367, and the agreement thus, by making no provision for fees, *id.,* inferentially waived fees under that statute. Here, however, the settlement was concluded well before the EAJA took effect, and thus did not waive fees under that Act.

*Jennings v. Metropolitan Government of Nashville and Davison County,* 715

---

**16.** This court's opinion also showed that Congress had manifested strong disapproval even of the *Lynn* result. 405 F.Supp. at 1289–90.

**17.** Further, any residue left in the fund after claims were paid was to be returned to HUD's reserve fund. *Dubose v. Harris,* 82 F.R.D. at 594 (Stipulation ¶ 3(e)).

**18.** *But see Dubose,* 82 F.R.D. at 595 (Stipulation ¶ 4(d) (Stipulation did by implication bar fees for work on settlement administration)).

F.2d 1111 (6th Cir.1983), is similarly distinguishable. There, the Sixth Circuit construed a settlement agreement, which was silent as to attorney fees, as barring such fees, because "the parties intended the settlement to be a final disposition of all claims." *Id.* at 1114. The court thus disallowed fees sought under 42 U.S.C. § 1988. In *Jennings*, the relevant fee statute was in force when the settlement was reached. In the case at bar, however, the fee statute had not yet been enacted at the time of settlement, and it cannot be inferred that the parties intended the settlement to dispose of a fee claim which did not yet exist.

Although not argued by the defendants, certain aspects of attorney Sturdevant's fee request raise the possibility of "special circumstances" which would make an award unjust. Discussion of this point is deferred until part VII.

### III. PLAINTIFFS' CLAIMS CONCERNING HOURS SPENT AND HOURLY RATES

 The EAJA instructs specifically how to compute a fee award:

"[F]ees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.).

28 U.S.C. § 2412(d)(2)(A).

Plaintiffs contend that a multiplier should be employed to adjust upward the attorneys' fees in this case.[19] I disagree. The statute does not specifically provide for a multiplier. I need not determine, however, if Congress intended to allow such an upward adjustment, because in my opinion one would not be justified in this case. The performance of counsel in this case, while quite sound, was not so extraordinary as to justify a multiplier or any higher fee. Since HUD's position was not substantially justified, there was no great risk of failure. *See also Dubose*, 82 F.R.D. at 585 n. 12 (showing uniform success of plaintiffs against HUD across the country). Further, the extremely generous settlement which counsel obtained from HUD—amounting not to a true compromise, but rather an agreement by HUD to give plaintiffs *all* that they asked for—must have arisen not by reason of plaintiffs' especially skillful bargaining, but by HUD's realization that the adverse judicial decisions left it with no bargaining chips. Finally, the settlement administration, even if performed quite well, was not primarily work of a legal nature.[20]

The court in *Underwood II* granted a multiplier of 3.5. Slip op. at 8. That court apparently inferred that it had authority to

---

**19.** Multipliers have been allowed under the common fund theory, *e.g., City of Detroit v. Grinnell Corporation*, 495 F.2d 448, 471 (2d Cir. 1974), and under statutes providing for recovery of "reasonable attorneys' fees" in civil rights cases, *Cohen v. West Haven Board of Police Commissioners*, 638 F.2d 496, 505 & n. 15 (2d Cir.1980).

**20.** *Cf. Hensley v. Eckerhart*, — U.S. —, 103 S.Ct. 1933, 1940 n. 9, 70 L.Ed.2d 40 (1983). The Supreme Court noted that in the decision to adjust fees upward or downward, the district court may consider factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974) to the extent they are not subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate. Included in the factors in *Johnson* are the skill requisite to perform the legal service properly and the novelty and difficulty of the questions and the time and labor required. "It is appropriate to distinguish between legal work ... and work which can often be accomplished by non-lawyers." 488 F.2d at 717–18.

grant a multiplier from the provision that a "special factor" could authorize an award in excess of $75 per hour. *Id.* at 2. In *Underwood,* the court was presented with a limited availability of qualified attorneys—a situation in which the statute specifically allows awards in excess of $75 per hour. Judge Pregerson explained, "This litigation was complex and' protracted. Few attorneys possess the special skills and qualifications needed to handle successfully the litigation and settlement activities required by this case."

In the present case, however, this court was not faced with a similar shortage of qualified counsel.[21] As discussed *supra,* this case presented a relatively simple question of whether HUD abused its discretion in refusing to put a housing subsidy program into operation. HUD's unreasonable position made this an easy case for plaintiffs, as evidenced by the unanimous rulings of lower courts against HUD in suits across the country. *See Dubose v. Harris,* 82 F.R.D. at 585 & n. 12 (citing district and circuit court opinions). Because an unusually high degree of legal talent was not required in this case, there was no dearth of lawyers who could have achieved similar results. Therefore, the "special factor" justifying the multiplier in *Underwood* is not present in the case at bar.

In the absence of such a special factor and any extraordinary performance of counsel, I find no basis for granting a multiplier. Such an award would provide plaintiffs with an undeserved windfall. *New York State Association for Retarded Children v. Carey,* 711 F.2d 1136 (2d Cir. 1983).

Each organization or attorney claiming fees has supported its claim with affidavits by all counsel for whose work compensation is claimed. These affidavits setting forth the time, amount, and nature of the work claimed are summarized below.[22] The affidavits are all based on reconstructed time records, except for the affidavits by attorney Shay (for NLS), and that part of attorney Sturdevant's affidavits covering the period from April 1982 onward, which are based on contemporaneous time records.[23]

## A. *NLS, NHLA and LASH*

[11] Three of the parties—NLS, NHLA, and LASH—have reached a partial settlement, filed with this court August 17, 1983. The parties have stipulated that, if it is ultimately determined that any award for work before this court is proper, the amount of the award shall be $2,425.50 to LASH for work by attorney Norko, $1,620.00 to LASH for work by attorney Pilver,[24] $3,577.50 to NLS for work by at-

**21.** The qualifications required of the *Dubose* counsel and the availability of qualified counsel as relating to Mr. Sturdevant is discussed at note 32 and pages 959 *et seq. infra.*

**22.** The documents in the record which spell out plaintiffs' claims are unfortunately spread far and wide. The reader is referred to docket entries 145, 161, 162, 164, 166–170, 174, 179, 189, 199–201, 203, and 246 in *Dubose v. Pierce,* No. H–75–303; docket entries 47–49 in *Morales v. Pierce,* No. N–76–44; docket entry 42 in *Grundman v. Pierce,* No. H–76–160; docket entry 40 in *Pleasant v. Pierce,* No. H–76–26; and docket entry 77 in *Johnson v. Pierce,* No. H–76–109. The *Dubose* docket is being used as a master docket for the eight consolidated actions, and any further submissions should be under that caption.

**23.** The Second Circuit has prospectively converted its "previously expressed preference for con-

temporaneous time records, *McCann v. Coughlin,* 698 F.2d 112, 131 (2d Cir.1983); *In re Hudson & Manhattan R.R. Co.,* 339 F.2d 114, 115 (2d Cir.1964), into a mandatory requirement, as other Circuits have done [citations]." *Carey,* 711 F.2d at 1147. Any claims for fees for "work done after the date of this opinion [June 19, 1983]" must be supported with contemporaneous time records. *Id.* at 1148.

**24.** Mr. Norko states that he spent 38.5 hours on this case preparing papers filed on October 29, 1975, November 12, 1975, and March 25, 1976. In 1975, Mr. Norko had four years of experience. LASH originally claimed a rate of $70/hour.

Ms. Pilver states that she spent 36 hours on this case preparing papers filed on October 29, 1975, November 12, 1975, February 27, 1976, March 25, 1976, and June 28, 1976. In 1975, Ms. Pilver had three years of experience. LASH originally claimed a rate of $50/hour.

torney Shay,[25] and $4,083.75 to NHLA for work by attorney Morrison,[26] for a total of $11,706.75. The parties arrived at these figures by accepting the hours and rates in the attorneys' affidavits, with some adjustments, as follows. Hours spent on the fee motion itself were omitted; the remaining hours were reduced by ten per cent; and any claimed rates above $75/hour were reduced to $75/hour. The agreement permits plaintiffs' counsel to seek additional fees, at a rate of not more than $75/hour, for work done on any future appeals initiated by HUD, but not on appeals initiated by plaintiffs. The amounts specified in the stipulation are hereby approved as reasonable. In a case so weighed down with paper, reflecting many points of dispute, the court applauds this partial settlement.

## B. *CLS*

CLS claims fees for the work of attorneys Sturdevant, O'Brien, Janes, Zeldis, McCoy, Wirzbicki, Korn, Dale, and Rosenstein. CLS asserts that hourly rates according to the following table are reasonable:

| years of experience | hourly rate |
| --- | --- |
| 0 | $ 40 |
| 1 | 50 |
| 2 | 60 |
| 3 | 70 |
| 4 | 80 |
| 5 | 95 |
| 6 | 110 |
| 7 | 110 |

Attorney James C. Sturdevant spent 1,312.75 hours on various tasks for this case from October 1975 through April 1978. Mr. Sturdevant graduated in 1972 from Boston College Law School and has been a member of the Connecticut bar since 1973. When assigned to handle this case, therefore, Sturdevant had less than three years' experience at the bar. He worked for CLS and its predecessor organization, Tolland-Windham Legal Assistance Program, from 1972 until 1978.

Attorney Dennis J. O'Brien spent 387 hours on various tasks for this case from August 1975 through March 1980. One hundred of these hours were spent in efforts directed at locating and informing potential claimants. Five of the hours were directed at persuading the State of Connecticut that settlement payments should not affect recipients' AFDC eligibility. O'Brien Affidavit filed Nov. 17, 1982 ¶ 10(*o*)(ii), (iii).

Attorney Norman K. Janes spent 79 hours on various tasks for this case from July 8, 1975, through November 21, 1975, and an additional five hours preparing his affidavit for this motion.

Attorney Martin Zeldis spent 34 hours on various tasks for this case from December 30, 1975, through December 1979, and an additional four hours preparing his affidavit for this motion. His work included up to five hours spent toward implementing the settlement. Zeldis Affidavit filed Nov. 15, 1982 ¶ 4(j) ("[c]lient contact, class contact, form consideration and distribution and claim collection re settlement of case, September, 1979 through December, 1979").

Attorney William E. McCoy spent 36.5 hours on various tasks for this case from January 1976 through April 1978, and an additional two hours preparing his affidavit for this motion.

Attorney John Wirzbicki states that he spent 32 hours on various tasks for this case from January 21, 1976, through December 1979, and an additional two hours preparing his affidavit for this motion. This time included up to five hours toward implementing the settlement. Wirzbicki Affidavit filed Nov. 17, 1982 ¶ 4(i) ("[c]lient contact, form distribution and claim collec-

---

**25.** Ms. Shay, who has been in legal services practice since 1963, states that she spent 53 hours on various tasks for this case from October 6, 1975 through June 11, 1976. NLS originally claimed a rate of $100/hour.

**26.** Mr. Morrison, who practiced with NHLA from 1973 until 1982, states that he spent 60.5 hours on various tasks for this case from January 1976 through August 1976. NHLA originally claimed a rate of $125/hour.

tion re settlement of case, September, 1979 through December, 1979").

Attorney Martin N. Korn spent 66 hours on various tasks for this case from March through June 1976, preparing filings and preparing for and attending a hearing, and an additional five hours preparing his affidavit for this motion.

Attorney D. Michael Dale states that he spent 85 hours on various tasks for this case from January 1976 through spring 1979, and an additional two hours preparing his affidavit for this motion. Up to two of the hours claimed concerned settlement implementation. Dale Affidavit filed Nov. 30, 1982 ¶ 7.

Attorney Ronald S. Rosenstein spent 62 hours on various tasks for this case from March 10, 1976, through 1979, and an additional five hours preparing his affidavit for this motion.

### C. *Sturdevant (individually)*

Attorney James C. Sturdevant claims a personal right to fees for work he performed from May 1, 1978 through December 1982. Mr. Sturdevant spent 2,294.25 hours on various tasks for this case during that time. He claims hourly rates according to the same table as that used by CLS, *supra* p. 954.

### D. *San Fernando*

San Fernando claims that fees for part of the work set forth in Sturdevant's fee motions should be paid to it and not to Sturdevant. The work in question is that done from October 9, 1978, through April 30, 1980, during which time Sturdevant was a full time employee of San Fernando. Of the 2,294.25 hours claimed by Sturdevant individually in his motion, 1,329.5 fall during this time period.

As to the amount of any fee award involved, San Fernando relies on Sturdevant's statements of his hours and his claims regarding appropriate hourly rates. This dispute between San Fernando and Sturdevant will be discussed in section VI *infra.*

### IV. THE COMPENSABILITY OF THE HOURS CLAIMED

### A. *Categories of Noncompensable Work*

■ Various categories of work are noncompensable. These include settlement administration, lobbying, work on reasonably separable issues on which plaintiffs did not prevail, defense of the settlement against project owners, and work on fee motions. Further, a penalty is appropriate for the use of reconstructed time records.

#### 1. *Settlement Administration*

No fees may be awarded for "settlement administration" (defined *supra* p. 944) because the Stipulation for Settlement bars such fees. Although paragraph 4(d) of the Stipulation, reported at 82 F.R.D. at 595, states that HUD would provide certain items to aid in settlement administration—a franking privilege, a WATS line, and payment for the cost of assembling and copying documents requested of PW by HUD for auditing purposes—the paragraph then concludes: "It is the intent of the parties that distribution of the settlement fund shall involve no other substantial costs or expenditures by HUD." This provision rules out payment by HUD of attorney fees for work in settlement administration, even though such fees might otherwise be proper, *In re Folding Carton Antitrust Litigation,* 557 F.Supp. 1091, 1111 (N.D.Ill.1983); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F.Supp. 680, 695 (D.Minn.1975).[27]

---

27. Sturdevant and San Fernando assert that in some cases HUD failed to perform its duties under the settlement agreement, and that Sturdevant at times did what should have been HUD's work. For example, they assert that HUD did not perform its obligations regarding posting and distributing notices in projects, and that as a result Sturdevant spent time to ensure that such notices were posted and distributed. Plaintiffs argue that HUD should not be able to rely on the agreement's provision limiting its expenditures on settlement administration to shield it from the effects of its breach of other parts of the agreement.

■ Almost all of Sturdevant's activities as a member of the COC are thus not compensable.[28] The sole exception has to do with motions which concerned the legal interpretation of the agreement rather than the mechanics of distribution. Plaintiffs have called attention to four such motions. First, for the 25 per cent of the projects in which HUD had no data on the "gap" values (values for increases in the property taxes and utility costs), plaintiffs moved to use a statistical regression formula to estimate these values. Second, plaintiffs moved to have that formula applied to projects for which HUD had supplied data indicating zero or negative "gap" values. Third, plaintiffs moved that the minimum recovery for any eligible claimant should be $20. Fourth, when HUD moved that the principal remaining in the reserve fund after payments were made (about $15 million) be returned to HUD, plaintiffs requested that HUD be required to obligate that money promptly for operating subsidies mandated by 1977 legislation. In all four cases, plaintiffs prevailed. Work on these motions is therefore compensable.[29]

### 2. Lobbying

Hours spent lobbying Congress, as well as federal and state agencies, are not compensable. The EAJA provides for fees "incurred ... in any civil action." Lobbying, even if related to the suit, is not such an expense. Further, the Act's purpose was to provide compensation for the "vindication of ... rights in civil actions and in administrative proceedings," as distinguished from enlargement of remedies through the legislative process. EAJA § 202(a), 94 Stat. 2325.

Even lobbying HUD itself is not compensable. While negotiating with HUD's counsel, or with other HUD officials at their direction, is within the ambit of litigation, other contacts with HUD personnel concerning HUD's position in the litigation are not.

### 3. Work on Reasonably Separable Issues On Which Plaintiffs Did Not Prevail

The plaintiffs may be considered prevailing parties in this action because they achieved many of the benefits sought in bringing suit. *Hensley v. Eckerhart*, —— U.S. ___, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Nevertheless, no fees should be awarded for work on issues on which plaintiffs did not prevail, if such issues are

---

This argument has some appeal. However, Sturdevant and San Fernando have not shown that the *Underwood* court authorized Sturdevant to do these extra tasks. Without a showing of such authorization, I cannot tell whether such tasks were necessary, or were, rather, gratuitous intermeddling. Therefore, compensation for such tasks will be denied.

**28.** Certain tasks, such as seeking rulings regarding the taxability of the interest accumulated by the settlement fund, and trying to convince federal and state agencies that payments under this settlement should not count as income for the purpose of evaluating claimants' eligibility for various aid programs, were ancillary to the fund distribution. Paragraph 4(d) of the Stipulation bars fees for such tasks as well. *Dubose v. Harris*, 82 F.R.D. at 595.

Similarly, work to define the COC's structure and function is not compensable.

**29.** The court in *Goldhaber v. Foley*, 698 F.2d 193, 197 (3d Cir.1983) reasoned that, in a suit against the government involving "two or more independently dispositive claims," the plaintiff

should collect fees under the EAJA only for work on those claims for which the government's defense was not substantially justified. However, the four motions described in the text dealt not with "independently dispositive claims" but with supplemental proceedings, all stemming from the single claim that HUD improperly suspended the section 236 operating subsidy program. It has been determined that HUD's defense to that single claim was not substantially justified. For plaintiffs to recover for work on these supplemental motions, it is sufficient that they prevailed.

Plaintiffs did not prevail on two post-settlement motions to hold HUD in contempt, and these motions are reasonably separable from the rest of the case. Accordingly, no fees could be awarded for work on these motions, even if such work were otherwise compensable. *See infra* p. ——. *Cf. Hensley v. Eckerhart*, —— U.S. ___, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (in attorney fees case arising under 42 U.S.C. § 1988, where a plaintiff who is a "prevailing party" fails to prevail on claims unrelated to the claims on which he succeeded, attorney's fees may be reduced).

reasonably separable from or unrelated to the rest of the case.

As the Supreme Court recently explained:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants—often an institution and its officers, as in this case—counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." *Davis v. County of Los Angeles*, 8 E.P.D. ¶ 9444, at 5049 (CD Cal.1974). The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Hensley v. Eckerhart*, 103 S.Ct. at 1940.[30]

In this suit, plaintiffs initially claimed not only that HUD should fund the operating subsidy program, but also that certain rent increases authorized by HUD were improper. Plaintiffs did not pursue this second claim.[31] Accordingly, no fees may be awarded for work on this claim.

HUD also points to unsuccessful procedural motions by plaintiffs, such as their motion to the Supreme Court to vacate the stay imposed by the Second Circuit. These motions are not sufficiently separable from the case as a whole to warrant any denial of fees for work on them. Additionally, the results obtained in this case—an agreement by HUD to give plaintiffs *all* they asked for—makes this request reasonable.

### 4. Defense of the Settlement Against Project Owners

Fees should not be awarded for work on issues in which HUD did not oppose plaintiffs. *Cf. Firebird Society v. Members of Board of Fire Commissioners*, 433 F.Supp. 752, 755 (D.Conn.1976), *aff'd*, 556 F.2d 642 (2d Cir.1977) (per curiam); *Vulcan Society of Westchester County v. Fire Department*, 533 F.Supp. 1054, 1061 (S.D. N.Y.1982). In this case, some project owners opposed the settlement agreed to between HUD and plaintiffs. Plaintiffs' work in defending the settlement agreement against this challenge is thus not compensable.

### 5. Work on Fee Motions

In *Carey*, the Second Circuit held that, because the use of reconstructed time records had complicated both sides' effort on the fee motion, an award of fees for time spent on the fee motion itself was inappropriate. 711 F.2d at 1148. The same reasoning applies here. Almost all of the time records submitted by plaintiffs in this action are reconstructed, *see supra* p. 953, and their use not only has cost plaintiffs considerable time in reconstructing these records, but also has substantially increased the argument, and the level of confusion, on these motions. Accordingly, fees for work on fee motions will be denied.

### 6. Penalty for Use of Reconstructed Time Records

■ All otherwise allowable hours will be reduced by ten per cent if they are based on reconstructed time records. This penalty follows the practice of *Ross v. Saltmarsh*, 521 F.Supp. 753, 761–62 (S.D.N.Y. 1981), *aff'd*, 688 F.2d 816 (2d Cir.1982) (fee award under 42 U.S.C. § 1988). *Cf. Hens-*

---

**30.** Although the *Hensley* case dealt with 42 U.S.C. § 1988, the Supreme Court noted "[t]he standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" 103 S.Ct. at 1939 n. 7. 28 U.S.C. § 2412(d)(1)(A) provides for fee awards "to a prevailing party other than the United States." *See also* House Report 11, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 4990 ("prevailing party" to be interpreted as in existing statutes).

**31.** In fact, this court indicated in an earlier opinion that this second claim was of quite doubtful validity. *See Dubose*, 405 F.Supp. at 1279 n. 10.

*ley v. Eckerhart*, 103 S.Ct. at 1942 n. 13 (district court's reduction of attorney's hours to account in part for his failure to keep contemporaneous time records was held proper).

B. *HUD's Other Objections Rejected*

Except as noted in part A above, the hours claimed were reasonably spent for compensable work and reasonable in light of the level of success achieved. *Id.* at 1942.

HUD complains that attorney Sturdevant spent considerable time in conferences both with attorneys involved in this action and attorneys involved in similar actions outside the state. Given the multiplicity of suits across the country, coordination among counsel was necessary and reasonable. *Cf. Copeland v. Marshall (Copeland III)*, 641 F.2d 880, 904 (D.C.Cir.1980) ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in a response." (footnote omitted)). Indeed, such coordination may have contributed substantially to plaintiffs' success nationwide in the operating subsidy cases, and such uniform success may have paved the way for the settlement eventually achieved.

HUD complains also of the time spent by Sturdevant in following the progress of the settlement in *Abrams* (on which settlement the settlement in this action depended, *see supra* p. 943), and in submitting amicus briefs, on behalf of the plaintiffs in this action, to the courts in *Underwood, Ross,* and *Abrams.*

HUD points to the provision in the EAJA that fees shall be awarded for expenses "incurred by th[e] party in any civil action (other than cases sounding in tort) brought by or against the United States *in any court having jurisdiction of that action,*" 28 U.S.C. § 2412(d)(1)(A) (emphasis added). HUD asserts that expenses incurred for amici briefs submitted to the courts in *Underwood, Ross,* and *Abrams* were not "incurred ... in any court having jurisdiction of th[is] action." However, these amici briefs were reasonably necessary to protect the interests of plaintiffs in this action, and as such they were reasonably incurred in pursuing litigation before this court.

## V. THE APPROPRIATE HOURLY RATES

 The rates claimed by plaintiffs reasonably reflect the value of their services. In this determination, historic rather than current rates are to be used. *Carey*, 711 F.2d at 1152–53. Therefore, the historic hourly rates claimed by plaintiffs will be allowed, subject to a ceiling of $75/hour.

The EAJA's $75/hour fee limit applies "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). Since fees are sought almost entirely for work done before the Act's effective date, it would be illogical to award a higher rate based on "an increase in the cost of living." I interpret the exception for "the limited availability of qualified attorneys" to apply only when the party, because of such limited availability, has actually paid in excess of $75/hour. Accordingly, that exception does not apply here, where the clients are non-fee-paying. Plaintiffs have suggested no other "special factor" which would justify an exception to the $75/hour limit. Accordingly, that limit applies.

## VI. THE DISPUTE BETWEEN STURDEVANT AND SAN FERNANDO

 The dispute between Sturdevant and San Fernando presents this court with a question of first impression—whether a former legal services lawyer who "took a case with him" upon leaving a legal services organization may be awarded fees for work done on the case thereafter. This issue is one with implications extending well beyond the financial fortunes of James Sturdevant.

For the sake of analysis, Sturdevant's fee requests may be viewed in three separate periods. First, from May 1, 1978

through October 8, 1978, when Sturdevant had left CLS but was not yet on the San Fernando payroll. Second, when Sturdevant worked for San Fernando from October 9, 1978 through April 30, 1980. Third, from May 1, 1980 until the present, when Sturdevant has been in private practice. I turn first to the second of these periods.

A distinction has to be drawn between whether services rendered are properly chargeable as costs (already considered in section IV *supra*) and who is entitled to receive such fees, the question next considered. From October 9, 1978 through April 30, 1980, attorney Sturdevant was a full time employee of San Fernando. Both Sturdevant and San Fernando claim the right to any fees for Mr. Sturdevant's work during this time. CLS has assigned to San Fernando any right which CLS may have to fees earned during this contested period.

A. *The Nature of the Dispute*

Mr. Sturdevant first began working on this case in October 1975 as an employee of the Tolland-Windham Legal Assistance Program (TWLAP), which later merged into Connecticut Legal Services (CLS), one of the fee claimants in this action.[32] O'Brien Affidavit (filed June 20, 1983) at 2–5. Initially, attorney Dennis O'Brien was lead counsel in this case. Starting in 1976, this position was turned over to Sturdevant who by that time had become CLS'

Housing Task Force Director. *Id.* ¶¶ 15, 16, 20. At the end of April 1978, Sturdevant resigned from CLS and moved to California. O'Brien succeeded Sturdevant as CLS' new Housing Task Force Director. *Id.* ¶ 21.

Sturdevant contends that incidental to his relocation there was a realignment of lawyer-client relationship which established him as the private attorney for the plaintiffs. There are very strong reasons to believe that such an arrangement not only did not occur, but was never even contemplated.

Before Sturdevant's departure, O'Brien, on behalf of CLS, permitted Sturdevant to continue to act as counsel in this action after his leaving CLS. O'Brien did so because Sturdevant seemed clearly the best attorney at hand for that role, and there seemed nothing improper with Sturdevant's working on the case while employed by San Fernando. O'Brien was under the impression that Sturdevant would begin his employment with San Fernando immediately after he left CLS. He states that, had he known that Sturdevant would work on this case as a private attorney and later personally claim attorney fees for work done while a San Fernando employee, O'Brien would not have agreed to allow Sturdevant to take this case with him when he left CLS.[33]

---

**32.** Mr. Sturdevant had graduated in 1972 from Boston College Law School, and had commenced employment in September of that year with TWLAP. Sturdevant Resume, Appendix 3 to Exhibit A to Memorandum of Law In Support of Motion of James C. Sturdevant for an Award of Attorneys' Fees (filed Sept. 27, 1982).

**33.** Paragraphs 23–27 of O'Brien's affidavit state:

23. I readily agreed to Mr. Sturdevant's offer to continue to handle *Dubose* after leaving CLS. I did so because:

a. Mr. Sturdevant had done an excellent job on the cases and could be expected to continue to do so;

b. The cases had become extremely complex procedurally or strategically and Mr. Sturdevant was the only Connecticut counsel who truly knew and understood all that there was to know about them at that time;

c. My new position as Housing Task Force Director as well as my many previously as-

sumed and inalienable commitments presented me with more work than I could reasonably handle, even aside from *Dubose;*

d. It was my understanding that Mr. Sturdevant was leaving CLS to go to work for another legal services program, San Fernando Valley Neighborhood Legal Services (SFVNLS) of Pacoima, California;

e. My experience indicated that it is a very common practice for legal services lawyers "transferring" from one legal services program to another to bring especially complex, affirmative class action lawsuits along with them and continue to work on them after the "transfer."

f. It had become apparent that *Dubose* and the nationwide operating subsidy class action, *Underwood v. Pierce* (Civil Action No. 79–131–HP, C.D.Calif.) would in all likelihood be resolved on the same general terms; Mr. Sturdevant had been working together with counsel for the plaintiff class in *Underwood* for

In fact, Sturdevant did not start work with San Fernando immediately, but instead commenced work on October 9, 1978, pursuant to an agreement made with San Fernando·in January 1978. Fee Hearing Transcript (June 1–2, 1983) 119–20; Sturdevant Declaration (Exhibit A to Memorandum of Law in Support of Supplemental Motion of James C. Sturdevant for an Award of Attorneys' Fees for the Period April 5, 1979 through December, 1982, filed Feb. 23, 1983) ¶¶ 7, 9–10. Thus, from May 1, 1978, through October 8, 1978, even though he was not on the payroll of any legal services agency, Sturdevant continued to function as counsel in this case. In this capacity, he participated in settlement negotiations with HUD. Fee Hearing Transcript at 120.[34] Neither HUD nor any

quite some time and it was certain that he would continue to do so to an even greater degree once he relocated to California.

24. When I agreed to permit Mr. Sturdevant to continue to serve as lead counsel for the plaintiffs in the *Dubose* cases for which CLS was responsible subsequent to April 30, 1978, I was somehow under the impression that he would begin his employment with SFVNLS *immediately* after his departure from CLS.

25. When I agreed to permit Mr. Sturdevant to continue to serve as lead counsel for the plaintiffs in the *Dubose* cases for which CLS was responsible subsequent to April 30, 1978, I had no idea whatsoever that Mr. Sturdevant would ever work on them in the capacity of a private attorney. The thought of any such contingency never occurred to me. All I knew was that Mr. Sturdevant was going to work for SFVNLS.

26. Had I known that Mr. Sturdevant was going to be working on *Dubose* as a private attorney and would later claim attorneys' fees in the cases for his own benefit for a period of time during which he was employed by SFVNLS, I would not have agreed to allow him to take the cases with him when he left CLS.

27. At no time prior to my initial awareness of Mr. Sturdevant's motions for attorneys' fees did I have any reason to believe that Mr. Sturdevant was working on *Dubose* as a private attorney while in the employ of SFVNLS.

34. In paragraphs 6(a)–(f) of an affidavit filed as Exhibit A to the Memorandum of Law in Support of Motion of James C. Sturdevant for an Award of Attorneys' Fees (filed Sept. 27, 1982), Sturdevant summarizes his activities during this period as follows:

a. In May, 1978, I expended at least 26.25 hours doing research with other counsel representing plaintiffs in cases similar to *Dubose* concerning the concepts and issues to be included in the proposed settlement plan to be sent to officials at HUD and the Department of Justice. The tasks included research on the likelihood of HUD obtaining a supplemental appropriation from the Congress, the effect of the proposed settlement on tenants who resided in projects which had switched to individual tenant-metering for utilities, and those portions of the plan calling for provision of necessary information including project data and increases in taxes and utilities for each project by HUD to plaintiffs' counsel.

b. In June, 1978, I expended at least 11.25 hours in drafting correspondence to other counsel for plaintiffs, reviewing comments on our proposed settlement plan, reviewing a letter addressed to us and officials of HUD and the Department of Justice by counsel for a national organization of federally assisted housing owners and managers, and on meetings concerning the likelihood of obtaining a supplemental appropriation from HUD. I also spent several hours drafting comments on behalf of the *Dubose* class on regulations proposed by HUD for implementation of the revised operating subsidy program mandated by the 1977 Housing and Community Development Act.

c. In July, 1978, I expended at least 12.25 hours drafting letters to the eight major national accounting firms soliciting proposals to accomplish the nationwide distribution, reviewing proposals submitted by several of these accounting firms, and meeting with other counsel for plaintiffs to interview selected accounting firms.

d. In August, 1978, I expended at least 78.25 hours reviewing HUD's counter proposal for the settlement distribution and plaintiffs' counsel's reply to the proposal submitted to us and HUD by the National Organization of Housing Managers and Owners; reviewing assorted correspondence; reviewing the proposal to accomplish the settlement distribution submitted by Price Waterhouse & Co.; reviewing other accounting firm proposals; preparing for settlement negotiations; and attendance and full participation for several days of settlement negotiations with plaintiffs' counsel in *Dubose* and other settling cases, and officials of HUD and the Department of Justice in Washington, D.C.

e. During September, 1978, I spent at least 11 hours reviewing draft settlement documents and in telephone conferences with John Dziamba concerning suggested amendments to the draft settlement agreement proposed by HUD, and at the end of the month reviewing all correspondence received during

Connecticut counsel questioned Sturdevant's authority to do so. *Id.* at 121.

On October 9, 1978, about five months after he had left CLS, Sturdevant started work with San Fernando. The terms of this employment are in dispute. Sturdevant contends that, when he accepted the offer, it was his understanding that he would continue as lead counsel in *Dubose* in his own right, in addition to fulfilling his responsibilities as a San Fernando employee. He claims to have understood that he would be permitted to use San Fernando's supplies and clerical personnel for *Dubose*, but that San Fernando would not be responsible for his actions in *Dubose*. Sturdevant Declaration (Exhibit A to Memorandum of Law in Support of Supplemental Motion of James C. Sturdevant for an Award of Attorneys' Fees for the Period April 5, 1979 through December, 1982, filed Feb. 23, 1983) ¶ 10. This version is disputed by the three people from San Fernando involved in Sturdevant's hiring whose understanding was that Sturdevant would continue to work on the *Dubose* case as a San Fernando employee. Declaration of Percy Anderson and David Pettit (in Feb. 22, 1983 filing by San Fernando); Sun Deposition of October 8, 1982, taken in *Underwood v. Pierce*, eleventh page of text (pages are unnumbered in this court's copy); *see also* Fee Hearing Transcript at 124 (identifying those involved in hiring Sturdevant). On May 1, 1980, Sturdevant left the employ of San Fernando.

As evidence that *Dubose* was his private case, Sturdevant asserts that he was the only attorney who worked on the case; that he took the case files with him when he left San Fernando; that he personally incurred out-of-pocket expenses connected with the case; that others at San Fernando were not interested in the case; and that San Fernando had disclaimed liability for any possible malpractice by Sturdevant.

San Fernando replies, *inter alia,* that Sturdevant included *Dubose* in reports of San Fernando's activities; that, in connection with the case, Sturdevant publicly identified himself, and was identified by others, as a "San Fernando" or "legal aid" lawyer;[35] that Sturdevant was reimbursed for his expenses from the settlement fund by the *Underwood* court; and that San Fernando had an interest in the *Dubose* case, both because it affected many of San Fernando's clients and because San Fernando was co-counsel in a related action, *Sicuro v. Hills,* brought in the Central District of California.

Sturdevant and San Fernando agree that Sturdevant was a full time employee of San Fernando from October 9, 1978 through April 30, 1980. Reply Memorandum Objecting to Admissibility of Affidavit of Cynthia Padilla (filed Aug. 26, 1983) at 2. While Sturdevant worked at San Fernando, he reported time spent on *Dubose* on his time sheets, and he received credit for this time just as for time spent on other cases. Sturdevant Deposition of Jan. 18, 1983 at

the month from other counsel including officials from HUD and the Department of Justice.

f. During October, 1978, I expended at least 51.5 hours reviewing the final Settlement Agreement, drafting correspondence to my co-counsel in Connecticut and other counsel for plaintiffs in pending cases throughout the country, drafting a press release and appearing at a press conference in Los Angeles to announce the nationwide settlement, and drafting portions of the Stipulation for Settlement and the Motion to Amend Class Certification filed in November, 1978 in *Dubose.* In addition, I expended several hours included in the above total in researching a possible conflict of interest in my representation of the statewide classes certified in *Dubose* and in *Taylor v. Harris,* Civil No. H–78–86 (D.Conn.),

and in telephoning and corresponding with potential successor counsel for the plaintiff statewide class certified in *Taylor.* [Only part of this paragraph pertains to Sturdevant's work during the period from May 1, 1978 through October 8, 1978.]

**35.** It should be noted that in the Stipulation for Settlement, dated September 26, 1978, Sturdevant signed as:

James C. Sturdevant
San Fernando Valley Neighborhood Legal Services.

By contrast, just below Sturdevant's signature, John Dziamba signed as:

John Dziamba
Attorneys, acting on behalf of the plaintiffs in *Dubose* and the other Connecticut cases ....

82 F.R.D. at 605.

56–60. For this period of about a year and a half, Sturdevant claims (conservatively, as he states) 1,329.5 hours for work on *Dubose*.

## B. *Factual Conclusions*

As a factual determination, I find that there was no agreement among the parties that Sturdevant take the case as an individual practitioner. O'Brien's statement that he would not have agreed to let Sturdevant take *Dubose* with him when he left CLS had he known Sturdevant would claim it as a private case is accepted as true. Further, all of the persons having any connection with Sturdevant's transfer from CLS to San Fernando deny that any such arrangement was discussed or agreed to.[36]

Additionally, the contention that when Sturdevant left CLS in May 1978 he intended to take on the case in his individual capacity is open to question. Sturdevant asserts that his right to fees for services performed was created when he accepted the case as an individual practitioner rather than as a member of any legal service organization. The difficulty with Sturdevant's argument is that it rests on the assumption that he has the power of clairvoyance. The time during which Mr. Sturdevant was allegedly attempting to treat the *Dubose* case as his own—after May 1, 1978—was more than two years prior to the passage of 28 U.S.C. § 2412(b) (Oct. 21, 1980). Thus, Sturdevant could not have known of the attorney fees which would ultimately be available pursuant to the EAJA. Hence, while today it is understandable that Sturdevant wishes to characterize the case as his own—to do so is to put money in his own pocket—it is puzzling what motive Sturdevant would have had in 1978 for claiming individual responsibility for *Dubose*.

## C. *The Law Regarding the Dispute*

San Fernando received funding from the Legal Services Corporation. The Legal

Services Corporation Act of 1974, as amended, provides that the Corporation shall

> insure that attorneys employed full time in legal assistance activities supported in major part by the Corporation refrain from (A) any compensated outside practice of law, and (B) any uncompensated outside practice of law except as authorized in guidelines promulgated by the Corporation.

42 U.S.C. § 2996f(a)(4) (1976). Mr. Sturdevant does not dispute that during the time in question he was "employed full time in legal assistance activities supported in major part by the Corporation." *See, e.g.,* Memorandum of Law in Support of Supplemental Motion of James C. Sturdevant for an Award of Attorneys' Fees for the Period April 5, 1979 through December, 1982 (filed Feb. 23, 1983) 14–18. There can be no doubt that section 2996f(a)(4) thus applies to Mr. Sturdevant's work while he was on the San Fernando payroll.

The statute is clear. Compensated outside practice is prohibited; uncompensated outside practice is permitted only as authorized by the Corporation. This plain meaning is confirmed by the accompanying House Report.

> Attorneys employed full-time in legal services activities paid for by the corporation will be prohibited from engaging in any outside practice of law for compensation. It is expected that such attorneys, however, will be permitted to handle uncompensated legal work for their families, church groups, community organizations, and other parties so long as their uncompensated work does not interfere with their responsibilities to provide first-rate legal assistance to the poor in accordance with this bill.

H.R.Rep. No. 247, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 3872, 3880. And again:

---

**36.** These denials, credible in their own right, are bolstered by the determination *infra* that no such arrangement could have legally been made. Given the clear statutory prohibition of

any compensated outside practice of law, it is most unlikely that the San Fernando and CLS attorneys would ever have agreed to Mr. Sturdevant's scheme.

[the section provides] the insurance [*sic*] that attorneys employed full time by the legal assistance program refrain from any outside practice of law for compensation; and also that attorneys employed full time in legal assistance activities refrain from uncompensated outside practice of law except that deemed appropriate in guidelines promulgated by the corporation.

*Id., reprinted in* 1974 U.S.Code Cong. & Ad.News at 3890.

### D. *Legal Conclusions*

The clear meaning of 42 U.S.C. § 2996f(a)(4) prohibits compensated outside practice of law and thus bars Mr. Sturdevant's claim.

Sturdevant, however, relies on a Corporation regulation which purports to permit compensated outside practice of law by an "attorney [who] is newly employed and has a professional responsibility to close cases from a previous law practice, and does so as expeditiously as possible." 45 C.F.R. § 1604.4 (1982). The Legal Services Corporation (LSC) however "has consistently maintained that [45 C.F.R. § 1604.4] was intended to apply to matters that the attorney began while he or she was in private law practice, for clients who would not be eligible for legal services—not for matters for clients eligible for legal services begun while the attorney was employed by another legal services program," citing transcript of April 26, 1976, meeting of Legal Services Corporation Board of Directors where the proposed Part 1604 was described by the Board's Committee on Regulations. Amicus Curiae Memorandum of the Legal Services Corporation, filed Dec. 9, 1982, at 5 n. 4. Considerable weight is given to the LSC's interpretation of 45 C.F.R. § 1604.4. *Ford Motor Credit Co. v.*

*Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980) ("An agency's construction of its own regulations has been regarded as especially due ... respect.").[37]

Even if the court were to adopt a construction of the regulation that was favorable to Mr. Sturdevant, such a regulation would be invalid because it would conflict with the statute, which prohibits *all* compensated outside practice of law. Accordingly, an agreement between Mr. Sturdevant and San Fernando which purported to allow Mr. Sturdevant to retain any fees awarded for his work in this action would be void.

### E. *Policy Conclusions*

Mr. Sturdevant's attempt to use legal services program resources for his own enrichment is opposed in the amicus brief submitted by the Legal Services Corporation where it states: "for legal services attorneys the personal rewards of [their clients'] victories are limited to the knowledge that poor people's rights have been vindicated ...." Paradoxically the award of personal fees to public service lawyers would destroy the motive of public service lawyers to fight for the rights of the poor against the "entrenched bureaucracy." The rejection by Sturdevant of that virtuous motive may not be enough by itself to require that he be denied fees. In addition, however, a decision to grant Sturdevant's fee request would undercut the major justification for the granting of fee awards to legal service organizations. Defendants in attorney's fee cases have long contended that it is inappropriate to make awards to legal aid organizations which already receive public funding. The "argument is that 'double payment' is 'somehow un-

---

**37.** Similarly, it should be noted that LSC asserts: no legal services attorney has ever before even remotely suggested that he or she is personally entitled to an award of fees for work done on behalf of a client who was eligible for Corporation-supported legal assistance .... Any private agreement or secret contract between a full-time legal services attorney and the program that employed such an attorney which purports to create such an entitlement would, in our view, violate the Legal Services Corporation Act and regulations, requirements that cannot simply be waived upon the agreement of individuals or entities subject to those provisions. Amicus Curiae Memorandum of LSC, filed Dec. 9, 1982, at 3.

fair.'" *Dennis v. Chang*, 611 F.2d 1302 (9th Cir.1980). Courts have rejected these arguments, noting that such fee awards were contemplated by Congress and that "[f]ee awards in civil rights cases encourage legal services organizations to pursue such litigation because the awards permit replenishment of the funds available for the organization's work." *Dennis v. Chang*, 611 F.2d at 1306. *See also Palmigiano v. Garrahy*, 616 F.2d 598, 602 (1st Cir.1980) (public interest law firm "has finite resources, and a full fee award will enable it to undertake further civil rights litigation"). Endorsing this view, *see, e.g., New York State Association for Retarded Children v. Carey*, 711 F.2d at 1149 n. 8, the Second Circuit went on to state:

> we think it appropriate to end the uncertainty as to whether the fees of non-profit law offices will or will not be proportionately reduced to reflect the share of their budgets reimbursed by public funding, and we conclude that such reductions should not be made.

*Id.* at 1152.

Sturdevant, like the legal service organizations described *supra*, received public funds in the form of his salary and support staff from San Fernando during the period for which he now asks for fees for himself. An award to Sturdevant, in contrast to a legal services organization, will not replenish funds to vindicate the rights of the poor. Such monies would go for the private benefit of a for-profit attorney rather than to a publicly accountable organization. An award to Sturdevant in this case would indeed be a "windfall."

## VII. THE PERIODS DURING WHICH ATTORNEY STURDEVANT WORKED ON THIS CASE WHILE CLAIMING TO BE SELF-EMPLOYED

Sturdevant represents that he was self-employed during two periods of time when he worked on this case. No other counsel for plaintiffs challenge Sturde-

vant's personal right to fees for work done during these times; and, indeed, there is no evidence that he was on anyone else's payroll. This court, however, does not share such an easy attitude toward his petition for an award. During the first period in question—from May 1, 1978, through October 8, 1978—Sturdevant had left CLS but had not yet started his employment with San Fernando.[38] *See supra* pp. 960–961 & note 34. The second period runs from May 1, 1980, the date of Sturdevant's departure from San Fernando, until the present.

I find that general considerations of equity do not justify an award of any fees to Sturdevant for the time spent on *Dubose* while he was "self-employed." Section 2412(d)(1)(A) of the EAJA prohibits an award of fees if "special circumstances make an award unjust." The legislative history of the section clarifies the meaning of "special circumstances."

> Furthermore, the Government should not be held liable where special circumstances would make an award unjust. This "safety valve" helps to insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts. *It also gives the court discretion to deny awards where equitable considerations dictate an award should not be made.*

H.R.Rep. No. 1418, 96th Cong., 2d Sess. 11, *reprinted in* 1980 U.S.Code Cong. & Ad. News 4953, 4984, 4990 (emphasis added). As the Second Circuit explained in *Oguachuba v. INS*, 706 F.2d 93, 98 (2d Cir.1983), "The EAJA thus explicitly directs a court to apply traditional equitable principles in ruling upon an application for counsel fees by a prevailing party." That case ruled that an applicant will be denied fees if he stands before the court without clean hands.

---

**38.** It should be noted that Sturdevant did not become a member of the California bar until 1980. Affidavit of Sturdevant (executed Dec. 29, 1982).

In ruling on Sturdevant's fee motion it is necessary to consider his actions during the entire litigation.

In viewing applications for such awards in the context of general equitable principles, we are not required to limit our scrutiny to a single action or claim on which the applicant succeeded but must view the application in light of all the circumstances.

*Id.* at 99.

Sturdevant claims that he intended to represent the *Dubose* plaintiffs in his private capacity beginning with the date of his departure from CLS. At various relevant times, however, Sturdevant failed to disclose this intent to CLS, San Fernando, Judge Pregerson or this court.

Sturdevant's plan for taking the case privately was never disclosed to O'Brien of CLS. As he explained in his affidavit:

When I agreed to permit Mr. Sturdevant to continue to serve as lead counsel for the plaintiffs in the *Dubose* cases for which CLS was responsible subsequent to April 30, 1978, I had no idea whatsoever that Mr. Sturdevant would ever work on them in the capacity of a private attorney. The thought of any such contingency never occurred to me. All I knew was that Mr. Sturdevant was going to work for SFVNLS.

O'Brien Affidavit ¶ 25.

At the June 1, 1983 hearing, O'Brien reiterated that he had not intended for Sturdevant to ever handle the case as a private attorney.

MR. STURDEVANT: No, I'm making the statement in support of my contention which Mr. O'Brien agrees with that Connecticut counsel looked to me to represent the class, not to anyone else.

THE COURT: That's all right, I understand that. But you could represent the class but not [in] a private capacity. I don't understand Mr. O'Brien agreeing to that.

MR. O'BRIEN: No.

Fee Hearing Transcript at 122–23.

I find that it was never O'Brien's intent to ever let Sturdevant take the *Dubose* case in his personal capacity. If Sturdevant had ever disclosed his true intent, O'Brien would never have allowed the case to be transferred from CLS. It would be inequitable to allow Sturdevant's lack of frankness to give him the opportunity for personal enrichment.

Similarly, Sturdevant's dealings with San Fernando were less than forthright. As mentioned *supra*, the three San Fernando employees involved in Sturdevant's hiring had been led to believe that Sturdevant would be working on the *Dubose* case as a San Fernando employee. Thus, for almost 19 months Sturdevant accepted his full salary from San Fernando without informing that organization that 30 to 40 per cent of his time was devoted to a case he considered to be his own.

Lastly, Sturdevant either confused or misled this court and the *Underwood* court as to his affiliation. As noted earlier, Sturdevant signed the stipulation for settlement approved by this court as "James C. Sturdevant, San Fernando Valley Neighborhood Legal Services." *Dubose*, 82 F.R.D. at 605. If Sturdevant in fact meant to be representing the *Dubose* plaintiffs in his personal capacity, such a signature was misleading to this court.

Similarly, although after May 1, 1980 Sturdevant was no longer in the employ of San Fernando, the *Underwood* court was not informed of this change in Sturdevant's employment. As far as the *Underwood* court could tell from its records, San Fernando, not Sturdevant, was representing the *Dubose* plaintiffs throughout the period in question. Reporter's Transcript of Proceedings on October 14, 1982 in *Underwood* (RT) (included in part in Feb. 22, 1983 filing by San Fernando) 58:22—59:4 (Judge Pregerson stated, "I think that the Court's records show that San Fernando Valley Neighborhood Legal Services was as an organization, through Mr. Sturdevant, counsel of record in this matter"); *id.* 73:21–24 (Sturdevant stated, "I don't recall any document that was specifically filed with this court identifying the contractual

**966**

relationship between me and San Fernando"). When he left San Fernando, instead of giving the court explicit notification Sturdevant simply filed changes of address. *Id.* at 72–74. So far as the *Underwood* court was concerned, therefore, the status of Sturdevant and San Fernando vis-a-vis this case remained the same. Not until the hearing of October 14, 1982 was the record set straight. *See id.*

If it is assumed that Sturdevant intended to take *Dubose* as his own, he was less than forthright in relaying this intent to others. Alternatively, if Sturdevant had no such intention, he has been duplicitous in his recharacterization of those events to this court. In either case, Sturdevant's conduct calls for a denial of his fee request.

My ruling that it would be inequitable to grant fees to Sturdevant personally does not detract from the fact that services have been performed which could justify an award. However, neither San Fernando nor CLS have claimed an interest in fees earned during the two periods during which Sturdevant was self-employed. Further, the plaintiffs in this case are not harmed by a failure to award fees because they have not incurred any costs. It is not for this court to make an award based on issues that the parties have neither raised nor defined. I therefore forego the opportunity to intermeddle by creating a claim where none exists.

### VIII. THE FEE AWARDS

#### A. *NLS, NHLA, and LASH*

NLS, NHLA, and LASH are awarded amounts totaling $11,706.75, per stipulation of parties, as explained in section III. NLS is awarded $3,577.50 for the work of attorney Shay; NHLA is awarded $4,083.75 for the work of attorney Morrison; and LASH is awarded $2,425.50 for the work of attorney Norko plus $1,620 for the work of attorney Pilver, for a total of $4,045.50.

#### B. *CLS*

CLS is awarded a total of $114,810.75 for the work of its various attorneys, computed as follows:

| | hours allowed | less 10% for time reconstruction | hourly rate | award |
|---|---|---|---|---|
| **O'Brien** | | | | |
| 1975 | 94 | 84.6 | $70 | $ 5,922.00 |
| 1976 | 126 | 113.4 | 75 | 8,505.00 |
| 1978–1979 | 62 | 55.8 | 75 | 4,185.00 |
| | | | | 18,612.00 |
| **Janes** | | | | |
| 1975 | 73 | 65.7 | 70 | 4,599.00 |
| **Zeldis** | | | | |
| 1975 | .5 | .45 | 70 | 31.50 |
| 1976 | 26.5 | 23.85 | 75 | 1,788.75 |
| 1979 | 2 | 1.8 | 75 | 135.00 |
| | | | | 1,955.25 |
| **McCoy** | | | | |
| 1976 | 25.5 | 22.95 | 40 | 918.00 |
| 1977 | 7 | 6.3 | 50 | 315.00 |
| | | | | 1,233.00 |
| **Wirzbicki** | | | | |
| 1976 | 27 | 24.3 | 40 | 972.00 |
| **Korn** | | | | |
| 1976 | 66 | 59.4 | 60 | 3,564.00 |
| **Dale** | | | | |
| 1976 | 85 | 76.5 | 40 | 3,060.00 |
| **Rosenstein** | | | | |
| 1976 | 56 | 50.4 | 50 | 2,520.00 |
| 1978 | 6 | 5.4 | 70 | 378.00 |
| | | | | 2,898.00 |
| **Sturdevant** | | | | |
| 1975 | 73.75 | 66.375 | 70 | 4,646.25 |
| 1976 | 515.75 | 464.175 | 75 | 34,813.12 |
| 1977 | 367 | 330.3 | 75 | 24,772.50 |
| 1978–1 (1/1–4/30) | 202.75 | 182.475 | 75 | 13,685.63 |
| | | | | 77,917.50 |

#### C. *San Fernando Valley Neighborhood Legal Services*

San Fernando Valley Neighborhood Legal Services is awarded a total of $15,187.50 for the work of attorney Sturdevant, computed as follows:

| | hours allowed | less 10% if time was reconstructed | hourly rate | award |
|---|---|---|---|---|
| **Sturdevant** | | | | |
| 1978–3 (10/9–12/31) | 105.5 | 94.95 | $75 | $ 7,121.25 |
| 1979–1 (1/1–4/4) | 91.5 | 82.35 | 75 | 6,176.25 |
| 1979–2 (4/5–12/31) | 28 | 25.2 | 75 | 1,890.00 |
| 1980–1 (1/1–4/30) | 0 | 0 | 75 | 0.00 |
| | | | | 15,187.50 |

## D. *Attorney Sturdevant*

No award will be made to Mr. Sturdevant personally.

HUD may pay the awards to NLS, NHLA, LASH, CLS, and San Fernando "from any funds made available to the agency, by appropriation or otherwise, for such purpose." 28 U.S.C. § 2412(d)(4)(A). If HUD does not pay such awards, they shall be paid by the government in the same manner as final judgments. *Id.*

The foregoing opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

SO ORDERED.